The People on relation of William Lomane v. William Hammond, Quartermaster General of the State of Michigan.

*Bounties.*— Act No. 23 of the Legislature of 1864, "authorizing the payment of bounties to volunteers in the service of the United States"—*Laws of* 1864, *p.* 53—was designed to distinguish between volunteers under the call of October 17, 1863, and those enlisting under the call of February 1, 1864, and to provide a bounty for the latter only.

Accordingly, where one enlisted in the military service of the United States March 12, 1864, and was credited to a town whose quota, under the President's call of October 17, 1863, was not full, it was *held*, that he was not entitled to the bounty provided for by said act.

*Heard January 26.    Decided May 3.*

Motion for *mandamus*.
The facts are stated in the opinion.

THE PEOPLE v. HAMMOND.

*Robinson & Brooks*, for the relator.

*Albert Williams*, Attorney General, for the respondent.

CHRISTIANCY J.:

This is an application for a mandamus to compel the Quartermaster General to pay to the relator—a soldier who enlisted in the township of Riley, St. Clair county, March 12th, 1864, and was mustered and credited to the township on the twenty-eighth day of the same month —a State bounty of $100, which he claims is justly due him under the eighth section of the "act authorizing the payment of bounties to volunteers in the service of the United States," approved February 5, 1864.

On the 17th day of October, 1863, the President of the United States, by his proclamation, made a call upon the several States for 300,000 men for the military service of the United States, under which call the quota of this State, and of the several Congressional Districts, was duly assigned by the proper authorities of the United States, and the quotas of the several townships and sub-districts in the State were duly apportioned and assigned by the Acting Assistant Provost Marshal General of the United States for this State, as early as the 7th of November, 1864. A portion of the men under this call had been furnished and credited to the several sub-districts prior to the 1st day of February, 1864, two men having been credited to the township of Riley under said call up to that time, leaving a balance due on the quota of that township on that day of twelve men.

On the 1st day of February, 1864, the President issued another call or order, in the following words:

"WASHINGTON, Feb. 1, 1864.
"It is ordered that a draft for 500,000 men, to serve for three years or during the war, be made on the 10th of March next, for the military service of the United States,

crediting and deducting therefrom so many as may have been enlisted or drafted into the service prior to the 1st day of March, and not heretofore credited."

On the 2d day of February, 1864, the Acting Assistant Provost Marshal General, Lieutenant Colonel Hill, before having received from the proper officer at Washington the assignment of the quota for the State or Congressional Districts, and before having received his instructions under said last order, issued certain instructions in refer ence to returned and re-enlisted veterans' then in the State, for the purpose of enabling them to obtain the local bounties. In this, among other things, he says:

" The additional call for 200,000 men will increase the quotas of the several townships, wards and sub-districts by two-thirds; and the returned veterans who may have been credited, on the muster-in rolls, to localities that had previously filled their quotas will now have the opportunity of receiving any local bounty paid by the several localities to which they were credited."

This was incidentally recognizing the order of the President of February 1st as, in effect, a call for 200,000 men in addition to the previous call of October for 300,000 men. But, so far as I have been able to discover, this was the only official act of that officer, or of the Federal authorities at Washington, recognizing the order of February 1st, 1864, as intended merely as an additional call for 200,000 men. On the other hand, the quotas of the State, and of the several Congressional Districts of the State, were afterwards assigned by the Provost Marshal General at Washington, and those of the sub-districts apportioned and assigned by his Acting Assistant here, under this call or order alone, without any recognition of the 'continued existence of the former call, which was treated as abrogated from the date of the latter, and it

13 MICH. — Q.

was upon this basis that settlements were made with the various districts in regard to their several quotas. But at the time this 500,000 call was issued, a bill authorizing the payment of bounties to volunteers in the service of the United States was pending in the Legislature, which had been introduced on the 28th day of January, and after receiving many important amendments, (mostly made after the 2d day of February,) was passed on the 4th, and approved by the Governor on the 5th day of February.

The eighth section of this act provides that:

"There shall be paid from the war fund of this State a uniform State bounty of $100 to each person below the rank of a commissioned officer, who may hereafter enlist and be mustered into the military or naval service of the United States, and who shall be credited on the quota of this State, or any military district thereof, under any call or order of the President or military authorities of the United States, or of this State, made or issued since the 1st day of January, 1864."

The relator enlisted on the 12th, and was mustered and credited on the 28th of March, 1864, before the township had furnished its quota under the 300,000 call — or three-fifths of its quota of 500,000 men — the time for the draft under the last call having been postponed from the 10th day of March until after his enlistment and muster. He made the proper demand, and furnished to the Quartermaster General the requisite evidence, to entitle him to the bounty, (if he is entitled to it under the act.)

The relator insisted that at the time of his enlistment and muster there was no call in force issued prior to January 1st, 1864, under which he could have enlisted; that the call of October 17th, 1863, for 300,000 men, was, in effect, revoked or abandoned, and ceased to have effect;

that the order of February 1st, 1864, for 500,000 men, was, from its date, the only order in force; that he, therefore, enlisted, was mustered and credited under this call, issued after the 1st day of January, 1864, and consequently that his case comes directly within the words and intention of the eighth section of the act.

If the question depended only upon the legal effect of the two calls or orders of the President, and the words of the eighth section of this act, as seemed to be taken for granted upon the argument, it would, I am inclined to think, be difficult to controvert the relator's claim. But the real question is not merely what was the legal effect of those orders, or whether both, or only the last was actually in force at the time of the passage of the act, but what was the intention of the Legislature to be gathered from the *whole* act, and the policy of the State as evinced by this and other acts relating to bounties? Did they mean to distinguish between those who had been called for under the call of October 17th, 1863, and the last 200,000 mentioned or included in the order of February 1st, 1864, giving a State bounty to the latter, but not to the former? Or, in other words, did they intend to grant the latter bounty only to the portion the State was bound to furnish of the 200,000 men who had not been called for in the previous call of October?

It must be remembered that volunteers had been called for by the Governor, and enlistments going on under the October call, and the quota of the State and sub-districts had been in part filled prior to the call of February 1st. The policy of the State had been to rely mainly for bounties upon voluntary contributions, or local bounties raised by committees or by townships, cities and sub-districts, etc., only one act, (that of March 6, 1863,) having been previously passed, which gave a State bounty, and that of only $50, in the discretion of the Governor, to men

enlisting in regiments, companies or batteries heretofore mustered from this State. But various townships, cities, etc., had voted to raise a tax or borrow money, or directed committees or township officers to advance or raise money to enable them to fill their quotas by volunteers, with the expectation that legislative sanction would be given to their acts; and this had been done under previous calls of the President. — See *Acts of March* 7, 1863, *Laws of* 1863, *pp.* 92 *to* 95. A similar course had been taken by various localities and sub-districts under the call of October, 1863, for 300,000 men, and the object of the first section of this act of February 5, 1864, is to legalize such action in reference to this and other former calls. The object of the second, third and fourth sections was to effect a like purpose. The second section legalizes the action of the Boards of Supervisors, the Common Councils of cities, the township boards or the legal voters of any city, township or county, where they had, in their corporate capacity, offered or agreed to pay any bounty, or issued bonds or evidences of indebtedness for any such purpose, and authorizes the issuing of bonds in pursuance of liabilities thus incurred.

The third section legalizes any bonds, warrants, certificates or other evidences of debt issued, or to be issued, by certain officers therein mentioned, in pursuance of resolutions theretofore adopted, for the purpose of filling the quota of any township, city, ward, etc., "under the draft first ordered for the 5th day of February, 1864," (which draft was ordered under the call of October, 1863, but which was never, in fact, made, but being postponed, the order of February 1, 1864, took its place,) "or the call previous thereto," and provides the mode of payment.

The fourth section gives the qualified electors of cities, wards and townships, by vote at the annual charter or township elections, or at legal meetings, on ten days' notice, to determine what sum shall be raised to be paid

as bounty, not exceeding $200, for men mustered into the service, credited, etc.

"On either of the three last calls of the President, and to determine in favor of or against allowing or paying advances or pledges made by individuals for raising bounties to fill the quota of the township, etc." "Under the two calls of the President of the United States next preceding the 20th day of January, 1864."

It is clear that all the preceding provisions, except, perhaps, some of those in the fourth section, refer to engagements already entered into, or liabilities already incurred by the different townships, wards, etc., for the purposes mentioned; and the object of the provisions is to legalize such past action. And though the provisions of the fourth section in reference to sums to be voted for paying bounties not exceeding $200, might, perhaps, authorize raising such sum by vote where no previous undertaking had been entered into to that effect; yet the provision extends to no case in which such engagement might not have been entered into, or such liability incurred already. All the provisions of this and the preceding sections must, therefore, be supposed to refer to calls under, and for the purpose of satisfying which, such engagements had been entered into, or in which it was probable they might have been entered prior to the passage of the act. And though the phrase, "the three last calls of the President," might literally include the call of February 1st, 1864, the act having been passed on the 4th, and approved on the 5th of February; yet it can hardly be supposed that the two, or, at most, three days, after this call had been issued at Washington, any such action could have been already taken in the several townships and sub-districts as to have incurred the class of liabilities here intended to be provided for. It is much more reasonable to suppose, (what I

find, on examination, to be the fact,) that these words being already in the original bill, as introduced three days before the call of February 1st, when they could not refer to that call, were never intended or understood as including it, and that it did not, therefore, occur to the members as necessary to be altered in consequence of this call. It will be noticed that the next clause of this section, for making good the pledges of individuals in raising bounties, is confined to the "two calls of the President next preceding the 20th day of January, 1864." It would seem from this that the Legislature were not willing to extend this provision in reference to individual advances or pledges further back than the two last calls, owing, probably, to the great danger of fraud and imposition under it, though as to township and other public or corporate action, where there was less danger, they were willing to go back one call further. But it is perfectly clear, from this clause, that the Legislature recognized the call of October, for 300,000 men, as one of the two calls next preceding the 20th day of January, 1864, and there can be no doubt that this, also, is one of the "three last calls" spoken of in the preceding clause; and in both cases provisions are made in reference to bounties quite different from those contained in the subsequent sixth section, which relates only to calls made after the 20th day of January, 1864. It is, therefore, evident, from a comparison of the fourth and sixth sections, that the Legislature did mean to make a distinction between the 300,000 men who had been called for in October, 1863, and those understood by them to be called for under the order of February 1st, 1864, or, which is the same in effect, between those who had been called for in October, 1863, and the last 200,000 covered by the call of February 1st, 1864, and that they intended to make, and did make, a different provision for bounties in the two cases. By the fourth section, the sums that

may be raised by cities, wards and townships is limited to $200, and the men called for by the "three last calls of the President." By the sixth section, applicable only to calls made after the 20th of January, 1864, the sum which may be raised by the township boards and the Common Councils of cities is restricted to $100. This section also clearly recognizes the call of February 1st, 1864, and the provisions of the section are made applicable to that and future calls. The language is:

"On any call for volunteers made by the President of the United States since January 20th, 1864, or which he may hereafter make."

Why this distinction in the amount of the bounties allowed to be raised by the local authorities in the two cases — *two hundred dollars* under *past* calls, and only *one hundred* on any call made, or to be made, after the 20th of January, 1864? The reason to me seems plain. The cases provided for in the sixth section, limiting the amount to be raised by the local authorities to $100, are intended to be the same as those for which a State bounty of $100 is provided in the eighth section, thus making the aggregate of the State and local bounty, under the sixth and eighth sections, the same amount as in cases provided for under former calls in the fourth section. Under former calls, and the provisions of the fourth section, the local authorities are relied upon for whatever amount is to be raised, not exceeding $200; under the sixth and eighth sections, the State raises one-half of this sum, and the local authorities are authorized to raise the balance, or so much of it as they may judge proper.

There was a very strong and controlling reason why the Legislature should, in granting a bounty, make a distinction between the 300,000 men who had been called for in October, 1863, and the balance of the last 200,000 included in the order of February 1st, 1864. Arrange-

ments had, it is fair to presume, been made in many, if not all, the sub-districts, for the raising of bounties to fill their respective quotas under the October call. The Governor, early in November, had issued his proclamation, calling for volunteers under it, and the military officers of the State had been active in encouraging enlistments. Those arrangements of the various townships and sub-districts, and the pledges given by them, would have reference to, and be limited in their operation and amounts by that call; and whatever sum had been fixed upon to be raised for that purpose, or which had been raised by loan or otherwise for that purpose, would still be applicable to the balance of the quota of the 300,000 men yet to be filled, after the 1st day of February, as well as before. If, therefore, the State were to give a bounty of $100 each for the balance of such 300,000 yet to be furnished, the result would be that the aggregate ⸖ bounty received by the men enlisting to fill such balance would be greater than that to be received by the last 200,000 required under the call of February 1st, 1864.

I think, therefore, it is apparent from the face of the act, construed with reference to the policy of the State as evinced by its former legislation, and the history of the times, that the Legislature did intend to make the distinction claimed by the respondent, between the 300,000 men who had been called for in the preceding October, and the last 200,000 included in the order of February 1st, 1864; and that they construed that order as the Acting Assistant Provost Marshal General had incidentally done two days before, as in effect, an additional call for 200,000 men. It is clear from the Governor's proclamation of February 11, 1864, calling for volunteers under this call of the President, that such was his construction of the order and of the act, and such seems to have been the understanding and practical construction

THE PEOPLE v. HAMMOND.

by the military authorities of the State. We do not mean to say that practical construction would necessarily be binding upon the relator, who claims to have enlisted on the faith of the act, if the fair construction of the act were different; but as we think the fair construction of the act is in accordance with this practical construction, we think the relator is not entitled to the State bounty of $100; and the motion for a *mandamus* must be denied.

CAMPBELL J.:

As I concur entirely in the views of the statute expressed . by .my brother Christiancy, I reserve my opinion upon the question how far the practical construction by the military authorities of the calls for troops can be reviewed.

MARTIN Ch. J. *dissenting:*

I cannot concur with my brethren in the disposition of this motion.

By the act of February 5, 1864, it is provided that, "There shall be paid from the war fund of this State a uniform State bounty of one hundred dollars to each person below the rank of comissioned officer, who may hereafter enlist and be mustered into the military or naval service of the United States, and who shall be credited on the quota of this State, or any military district thereof, under any call or order of the President, or military authorities of the United States, or of this State, made or issued since the first day of January, A. D., 1864: *Provided,* That none of the bounties provided for in this act shall hereafter be paid to any volunteer, being a resident of this State at the time of enlisting, who shall be credited to any sub-district, township or ward other than that in which he is enrolled, or, if not enrolled, where he resided at the time of enlistment."— *Session Laws* 1864, *p.* 58. §8.

This provision of the act is, in my mind, entirely independent of any of the provisions of the act intended to authorize or legalize the action of municipal corporations. It is a voluntary, free offer of the State of a bounty to the soldier. A call was made by President Lincoln on the 1st of February, 1864, for 500,000 men. Under this call the relator enlisted and was mustered in in the month of March following. What effect this call may have had upon previous calls, or how it would be interpreted by the War Department, or any officer of the General Government, is immaterial, for the State did not base its action upon any such foundation.

Lomane knew of this law, and acted upon his faith in the promise, which I regard as unqualified and independent of any other provision of the act.

I think he should be entitled to the bounty, and the writ should be issued.