## The People ex rel. John S. Nichols v. Friend Palmer, Quarter Master General.

*War bounties to volunteers : Construction of act No. 23 of 1864.* J. S. N. enlisted into the military service of the United States on the 9th of February, 1864, and was credited to the town of Algansee. At the time of his enlistment it was not known to the military authorities that the quota of Algansee of previous calls had been filled, and they refused to allow the State bounty authorized by the act of February 5, 1864; (*Laws of 1864*, §§, *p. 58* ) to which, only those who enlisted under the call of February 1st, and were reckoned as included in the additional 200,000 men, were entitled. ( *People v. Hammond, 13 Mich. 247* ). It now appears that the quota of Algansee of previous calls had been filled prior to the 5th day of February: *Held*, That he was entitled to the State bounty of $100 authorized by the act (No. 23 ) of February 5, 1864.

*Heard  October 8 and 27.  Decided October 28.*

Mandamus.

On the 27th day of April, 1869, the relator moved in this Court that the respondent be ordered to show cause why a peremptory mandamus should not issue to compel him to pay a State bounty of $100 to the relator, and offered the following affidavit :

" State of Michigan, County of Wayne.  On this twenty-third day of April, A. D. 1869, before me, a Notary Public, in and for the said County and State, personally

came John S. Nichols, who being by me duly sworn, deposes and says : That he is twenty one years of age, and a resident of the city of Detroit in said county and state. That during the month of February, 1864, and previous thereto, he was an actual resident of the township of Algansee, County of Branch, in the said State of Michigan.

"That on the 9th day of February, 1864, in consideration of a promise of a state bounty of one hundred dollars, he the said John S. Nichols, enlisted, and was regularly mustered into the military service of the United States, in Battery C., 1st Michigan Light Artillery, and was credited as appears by the records of the military authorities, on the quota of the State of Michigan on the last 200,000 of 500,000 call of February 1st., 1864, and was applied to the sub-district of Algansee, the township in which he actually resided at the time of his enlistment, on the quota of said township for the number of men required under said call, and that he was not at the time enrolled in any other township or ward in this State.

"That said promise of one hundred dollars, State bounty was a part of the contract and consideration of his enlistment, and was made by the recruiting officers of the State, in pursuance and by virtue of Sections 8 and 9 of the state bounty law of February 5, 1864.

" That upon application to the Quartermaster-General of the State he was refused this bounty, for the reason that the Quartermaster-General believed, from the incomplete returns which he had at the time, that deponent was applied on the first 300,000 of said 500,000 call of February 1st, 1864, and that the quota of the State under the old 300,000 call of October 17th, 1863, was not full.

" And deponent further says, that he is informed and verily believes, that the said Quartermaster-General greatly erred in his calculation of the credits of the State ; that at the time he had not complete returns of the enlistments

19 MICH.—W².

and credits of the State prior to the 5th day of February, 1864; that the credits at large due the the State on the call of February 1st, 1864, appear from official documents to be 6,991; that the local or township enlistments previous to the 1st day of February, 1864 were 6,689, as officially published by Colonel Hill, the Assistant Provost Marshal General of Michigan; and the number of township enlistments from the 1st to the 4th of February, 1864, inclusive, is 334, as appears by the record of the Adjutant-General of Michigan; and that the credits of veterans reenlisting in the field from this State, and applicable to that quota, previous to the 5th day of February, 1864, as appears by the published reports of the Adjutant-General of Michigan, for 1864, are upward of 4,473; that the Quartermaster-General based his calculations upon the local or township enlistments alone, not having at that time any official information of the number or extent of the credits at large, or of the credits of veterans re-enlisting in the field; that the quota of the State under the old call of 300,000 was 11,298, and that on the 5th day of February, 1864, the enlistments and credits due this State on that call as consolidated with the call of February 1st, 1864, was far more than 11,298, as appears from the full and complete official returns of enlistments previous to that date, which were in fact credited to that call; and that this deponent was actually credited on the last 200,000 of the 500,000 call of February 1st, 1864, and is therefore entitled to the state bounty of one hundred dollars, under said state bounty law of February 5th, 1864; that the present Quartermaster-General of the State admits the foregoing facts, and the justice of the claim of deponent to said state bounty, but declines the responsibility of interfering with the ruling of his predecessor on this subject, although the said ruling is admitted to have been made on the partial and incomplete returns as aforesaid."

An alternative mandamus issued; and the respondent showed cause.

The counsel for the relator and the respondent agreed upon the following facts :

1. The call of February 1st, 1864, for 500,000 men was a call of 200,000 additional men, and a re-call of the previous call of October 17th, 1863, for 300,000 men.

2. That the law of February 5th, 1864, as construed by the Supreme Court, gave bounty to the 200,000 additional men only. *13 Mich., 247.*

3. That the priority of the date of enlistment governed the priority of credit, and the muster-in of the recruit only confirmed his enlistment and credit.

4. That the quota of the State for the first 300,000 was 11,298.

5. That if this quota for the State was full prior to the 5th day of February, 1864, all who enlisted subsequently and were applicable to said 500,000 call, were credited to the last 200,000 of said call, and were entitled to said state bounty.

6. That the credits applicable were, first, credits at large; second, local or township credits; third, credits of veterans re-enlisting in the field.

7. That the official statement of the War Department of the credits at large applied to that call is 6,991.

8. That Col. Hill's published official report shows the township or local credits prior to Feburary 1st, 1864, applicable to that call to be 6,689; and that the number of township enlistments from the 1st to the 4th day of February, 1864, inclusive, as appears from the records of the office of the Adjutant-General of Michigan, 334, making a total of township or local credits for this State on said call, prior to the 5th day of February, 1864, of 7,023.

9. That the number of veteran credits re-enlisting prior to February 5th, 1864, and applicable to that call is 4,370, and upwards.

10. That the whole quota of the State of Michigan under the above named call for 500,000, (as officially stated) is 19,553.

11. That the number of men required of the State after credits at large were deducted, or the quota of the State actually distributed to sub-districts, under said call (as officially stated), was 12,562.

12. That the late Quartermaster-General Hammond, in refusing the state bounty to the relator, based his calculations upon the local or township enlistments alone, not having at the time official information of the number or extent of the credits at large or of the credits of veterans re-enlisting in the field.

*Robinson & Brooks,* for relator.

*Dwight May,* Attorney General for respondent.

COOLEY CH. J.

In order to determine whether the township of Algansee had filled its quota under the call of October 17, 1863, at the time the relator enlisted and was credited to that township, we think the authorities should have taken into account, and allowed the township its proportion, of the general credits which the State had already received upon that call at the hands of the general government, the benefits of which, as they could not be specifically applied to any localities, all localities were proportionally entitled to. And we think it was unimportant whether these credits had actually been reported to the state officers at that time or not. If they existed in fact, they reduced the quotas of the State and proportionally its several sub-districts to that extent.

Applying these credits as above indicated, and applying the credits actually given to Algansee before the relator en-

listed, it is made to appear in this case that its quota under the 300,000 call was then full, and he, consequently, must be regarded as credited under the 200,000 call, and is therefore entitled to the bounty claimed.

The writ will therefore issue as prayed.

CHRISTIANCY and GRAVES JJ. concurred.


CAMPBELL J.


If there were any room under the statute to consider the relative equities of volunteers, there is more reason to lean in favor of those who enlisted early, than of those who came later and upon larger inducements. But this law was construed in *People v. Hammond, 13 Mich., 247,* as applicable only to those enlisting and enrolled under the last calls for 200,000 men, in February 1864. In that case, I reserved my opinion upon the right of a Court to look into the findings and acts of the military authorities, because in any view of facts as then presented, the result of the case would not have been changed.

But I cannot think the Courts can in any manner consider whether a party enlisting has been rightly or wrongly credited. And the law never contemplated any delay in the settlement of these bounty questions.

The Quarter-Master General was required to pay the bounty to residents upon the certificate of the Provost Marshal on the affidavit of the party that the applicant was credited to the township or ward where he resided. It was necessarily implied that the credit must be on the call referred to. He was made a judge of the fact, and his payment would have been final.

By the quotas, as then made up, the township of Algansee, where relator lived, was in arrears at the date of

his enlistment.    If there was anything in existence which ought to have changed the quota of the State, it had not yet been definitely ascertained and allowed in reduction, and there was no certainty when it would be.    Both the Governor's proclamation and the orders issued by the military authorities declared the quotas to stand as previously published, adding two-thirds to each of allotments under the call for 300,000. And when relator was credited he belonged by the records on the first and not on the second call. I do not see how subsequent credits could change the position which he occupied when he became, if at all, entitled to demand a bounty.    His place was fixed when he actually enlisted.    The subsequent arrangements were all problematical, and until actually fixed, no one could tell with accuracy, how even the undisputed credits would be locally distributed.    The law could not have contemplated that the rights of any one should be dependent on the result of these complicated calculations, some of which, at least, could not have been possibly guessed at then, if any of them could. And the review of the transactions of the executive department, relating to matters especially belonging to its control, is not only difficult to be conducted intelligently, but in my view, foreign to the functions of a court of law.    I do not think we can review in this way the action of officers whose discretion should be respected.    It does not appear that any reduction was actually made of these quotas, or distributed in fact, and without this being done so as to affect the enlistment, the *ex post facto* discoveries cannot change relator s position. I do not differ with the computations of my brethren; but I do not recognise our right to act on them.