ADONIRAN J. SMITH v. HENRY H. APLIN, AUDITOR GENERAL.

*War bounties—Constitutional law—Vested rights—Appropriation of moneys by the Legislature—Statute of limitations.*

1. *Mandamus* will not lie to compel the Auditor General to draw his warrant on the State treasury in payment of the war bounty of $100 due a soldier under Act No. 23, Laws of 1864, there being no money in the treasury out of which such warrant could be lawfully paid, and none appropriated for that purpose, as shown by the Auditor General's return.

2. The following propositions are summarized from the opinion of Chief Justice CHAMPLIN:

   *a*—The *right* of soldiers coming within the provisions of Act No. 23, Laws of 1864, to a State bounty of $100, became a *vested* right, of which the Legislature could not lawfully deprive them.

   *b*—The proviso to Act No. 173, Laws of 1881, repealing the

war bounty acts of 1864 and 1871, recognized and preserved the rights of soldiers to their bounty under said acts, and is a distinct waiver, if one was needed, of the statute of limitations.

c—Plighted faith between the State and her soldiers, who in the hour of the country's peril enlisted in defense of the Nation, and went forth to do battle for the honor of the flag, and the preservation of our free institutions imperiled by the civil war, who suffered untold hardship, and who *all* risked life, and many fell, and others were wounded, on the field of battle, will not permit the plea of the statute of limitations to bar a sacred promise made to them, no matter how long a time has elapsed between the promise and the failure to discharge the obligation according to the terms in which it was made.

d—It was the duty of the Legislature to provide money for the payment of the war bounty offered by the State under Act No. 23, Laws of 1864, and the history of those times, of which the Court will take judicial notice, shows that that duty was performed.

e—The Legislature, by the acts of February 5, 1864, March 2, 1865, and March 21, 1865, provided ample means for paying the bounties offered under Act No. 23, Laws of 1864. These acts *authorized* and *directed* the Governor and State Treasurer, whenever necessary for the purpose of paying State bounties, to contract loans and issue bonds therefor, and pay the avails over to the credit of the " war fund," which bounties were directed to be paid from *this* fund upon the warrant of the Auditor General, upon proper vouchers or estimates of the Quartermaster General of the State, certified by the Governor. This was a sufficient appropriation by the Legislature, and authorized the Auditor General, until the passage of Act No. 173, Laws of 1881, to draw his warrant on this "*war fund*" whenever the money for the purpose of paying bounties reached that fund, upon proper certificates of the Quartermaster General and Governor.

f—The object and intent of the Legislature, in the passage of Act No. 173, Laws of 1881, was to do away with the authority of the Quartermaster General in allowing claims for bounties, and place claimants for bounties in the same category as others having claims against the State for adjustment.

*Mandamus.*  Submitted January 23, 1890.  Denied April 18, 1890.

Relator applied for *mandamus* to compel respondent to

issue a warrant on the State treasury for $100, claimed to be due him as "war bounty" under Act No. 23, Laws of 1864. The facts are stated in the opinion.

*H. J. Patterson,* for relator.

*S. V. R. Trowbridge,* Attorney General, and *Edward Cahill,* for respondent.

CHAMPLIN, C. J. The relator applies for a *mandamus* to compel the Auditor General to issue to him a warrant upon the State Treasurer for $100 bounty money to which he is entitled under the laws of the State of Michigan.

In his application for the writ the relator states that he was a private in Company H, Twenty-third Regiment of Michigan Infantry Volunteers, and mentioned in the certified copy of the certificate of the Quartermaster General, S. B. Daboll, as follows:

"QUARTERMASTER GENERAL'S OFFICE,
"LANSING, MICH., Jan. 24, 1889.
"I hereby certify that, as certified to this office by the Adjutant General of the State of Michigan from the records in the Adjutant General's office, Adoniram J. Smith, Co. H, 23d Regiment of Michigan Infantry, enlisted on the third (3) day of September, 1864, at Flint, Michigan, and was duly mustered into the service of the United States for the term of one year. Discharged at Salisbury, N. C., June 28, 1865.

"And I further certify that under Act No. 23 (Laws of) 1864, and by virtue of such enlistment, the said Adoniram J. Smith was entitled to a State bounty of $100, and that, as appears from the records in this office, there is now due him $100, on account of said bounty.
"S. B. DABOLL,
"Quartermaster General of the State of Michigan."

That shortly after the certificate was issued he presented it to the Auditor General of the State of Michigan, and requested him to issue his warrant on the State treasury for the sum of $100, as required by law, and the said Auditor General neglected and refused to issue the

same; that he has never received his State bounty, and the same is justly due him from the State of Michigan, and hence prays for the writ.

The Auditor General shows cause against the relator, as follows:

"3. He admits that directly after the certificate attached to relator's petition, and marked, 'Exhibit A,' was made, said relator presented the same to the respondent, and requested him to issue his warrant for the sum of one hundred dollars, and that the respondent neglected and refused to do, and still does refuse to issue to the said relator.

"4. That there is no money in the State treasury out of which the warrant demanded by the relator could be lawfully paid, if drawn by the respondent, and no appropriation has been made by law for that purpose.

"5. No voucher nor estimate of the Quartermaster General of the State, certified by the Governor, has been presented to the respondent, to authorize the issue of a warrant to the relator as by him demanded, or to the Quartermaster General for the relator's benefit.

"6. It does not appear from relator's petition on file whether the relator was credited on the quota of this State, or any military district thereof, under any call or order of the President or any military authorities of the United States, or of this State, made or issued since January 1, 1864, nor whether he was at the time of his enlistment a resident of this State, or where he resided, nor whether he was enrolled among the persons liable for draft, nor whether he was credited to the subdistrict, township, or ward in which he was enrolled, or in which he resided, and that he was not enrolled elsewhere in this State. It does not appear from the said petition whether any showing of such facts, or any of them, has ever been made to the Quartermaster General. And respondent avers, from an inspection of the official records of said Quartermaster General's office, that there is no record showing upon what quota, nor to what subdistrict, township, or ward, said relator was credited, nor where he was enrolled.

"7. That, if any right ever accrued to relator to have and receive the State bounty referred to in his petition filed in this cause, such right accrued more than twenty-

five years before the filing of said petition; nor did said right accrue to the said relator at any time within ten years next before the relator requested and received from the Quartermaster General the certificate attached to his said petition, and marked 'Exhibit A,' nor within ten years next before said relator presented said certificate to respondent, and requested him to issue his warrant for one hundred dollars, nor within ten years next before the filing of said petition.

"8. That at the time of his enlistment, as stated in his petition, there was no authority of law for paying any such bounty as is demanded by the relator, for the reason that the amount authorized to be raised by loan, by Act No. 24 of Session Laws of 1864, had been exhausted, and notice of the fact had been given by the proclamation of the Governor to the people of the State on, to wit, the 21st day of July, 1864, of which said relator had notice.

"9. That the respondent had no authority of law for drawing the warrant asked for by the relator, nor had the State Treasurer any authority for paying the same if drawn, because, by Act 173 of the Session Laws of 1881, all laws relating to the payment of said bounties were repealed."

The sections of Act No. 23, Laws of 1864, approved February 5, 1864, pertinent to our present inquiry, read as follows:

"SEC. 8. There shall be paid from the war fund of this State a uniform State bounty of one hundred dollars to each person below the rank of a commissioned officer who may hereafter enlist and be mustered into the military or naval service of the United States, and who shall be credited on the quota of this State, or any military district thereof, under any call or order of the President or military authorities of the United States, or of this State, made or issued since the first day of January, A. D. eighteen hundred and sixty-four: *Provided,* That none of the bounties provided for in this act shall hereafter be paid to any volunteer, being a resident of this State at the time of enlisting, who shall be credited to any subdistrict, township, or ward other than that in which he is enrolled, or, if not enrolled, where he resided at the time of enlistment.

"SEC. 9. The Quartermaster General of this State shall

pay to each volunteer mustered into the service as aforesaid, as soon thereafter as practicable, the sum of one hundred dollars as a State bounty; and for this purpose he is hereby authorized and required to cause blanks to be prepared similar to the pay-rolls used in the United States army, which shall exhibit the name, age, and place of residence of such volunteer, date of time and place of enlistment, and the place of credit and date of payment, and amount paid; and each volunteer, upon receiving said bounty, shall subscribe his name to such roll: *Provided*, The Quartermaster General shall not pay the bounty contemplated by this section to any person, being a resident of this State, unless he shall present the certificate of the provost marshal that he is credited to the township or ward in which he is enrolled, or unless such person shall present his own affidavit that the township or ward to which he is credited is the township or ward in which he actually resides, and that he is not enrolled elsewhere in the State."

Sections 1 and 2, Act No. 132, Laws of 1871, read as follows:

"SECTION 1. That whenever application shall be made to the Quartermaster General by any soldier, sailor, or marine, or by the widow, child, or children of a deceased soldier, sailor, or marine, for any bounty heretofore authorized by the laws of this State, it shall be the duty of the Quartermaster General to examine said claim, and, if it shall appear that said applicant is entitled to the sum claimed, or any part thereof, he shall make the necessary certificate showing the amount so due, which certificate he shall forward to the Auditor General. The Auditor General shall thereupon examine the books and records in his office, and if it shall not appear therefrom that said bounty, or any part thereof, has been paid to the claimant, or any other person, he shall draw his warrant upon the State treasury for the amount so due, the amount of which warrant, upon presentation thereof, shall be paid to the soldier, sailor, or marine, or to the widow, child, or children of a deceased soldier, sailor, or marine, named therein, and to no other person.

"SEC. 2. No bounty shall hereafter be paid excepting in the manner hereinbefore provided, and all acts and parts of acts inconsistent with the provisions of this act are hereby repealed."

The last act of the Legislature bearing upon the question at issue is Act No. 173, Laws of 1881, which reads as follows:

"That each and all of the several acts relative to the payment of bounties to volunteers contained in and constituting chapter nineteen of the Compiled Laws of Eighteen Hundred and Seventy-one be, and the same are hereby, repealed: *Provided*, That any and all rights heretofore accrued under any of said acts are hereby preserved, the same as if the above repeal had not been enacted."

The two acts first above quoted from are embraced in chapter 19 of the Compiled Laws of 1871.

Had the relator any rights which accrued under and by virtue of the acts repealed? If he had, they were saved by the proviso. If he became entitled to a bounty under the provisions of section 8 of Act No. 23, Laws of 1864, his right to receive the bounty became a vested right. It was held in *East Saginaw Salt Mfg. Co. v. State Auditors*, 9 Mich. 327, that, when the State offered a bounty upon all salt manufactured, after the act took effect, of 10 cents a bushel, and the relator had manufactured several thousand bushels before the act, passed two years later, took effect, amending the first act so as to offer a bounty of only 10 cents a barrel, the relator was entitled to the bounty it had earned under the first act; and the Court held that the relator had acquired a vested right to the bounty offered under the first act upon all salt manufactured before the second act took effect, and that it could not be deprived thereof by the last act. If the bounty earned by the manufacture of salt is a vested right of which the party cannot be deprived, how much more is a bounty a vested right which is earned by a soldier enlisting in the military service of the United States to do duty in the defense and maintenance of the government. In the one case the risk is the loss of

profits or property; in the other, the soldier risks his life
and limb, and all the hardships incident to the calling.
I have no doubt that the right to the bounty, under sec-
tion 8, of those coming within its provisions, became a
vested right, of which the Legislature could not lawfully
deprive the soldier.

It was the duty of the Legislature to provide money
for the payment of the bounty offered by the State, and
the history of those times, of which the Court will take
judicial notice, shows that the Legislature did provide a
war bounty fund, and borrowed money by the issue of
its bonds to supply such fund. And as long as the fund
lasted the soldier received his bounty under the law at the
time of enlistment, but the fund was not sufficient. The
means provided by the Legislature, by the first act, had
become exhausted, and our attention is called by counsel
for respondent to a proclamation which they claim was
issued by the Governor on July 21, 1864, calling attention
to the fact that the appropriations made for the purpose
of paying bounties had been exhausted.

By Act No. 24, Laws of 1864, approved February 5,
1864, the Legislature authorized the issue of bonds to
the amount of $500,000, to be called the "War bounty
loan of the State of Michigan," to provide means to pay
the bounties offered by Act No. 23, above cited. The
report of the State Treasurer made to the Governor, and
published in the Session Laws of 1865, shows that up to
November, 1864, there had been issued of war bounty
bonds, under the act of February 5, 1864, but $230,000.
As the proclamation was made on July 21, 1864, this
amount may have been exhausted, but authority was
given to issue to the amount of $500,000. By another
act approved March 2, 1865,[1] the Legislature authorized
the issue of $1,000,000 of bonds for the purpose of pay-

[1] See Act No. 85, Laws of 1865.

ing the $100 bounty, as provided in the act; and by a still later act, approved March 21, 1865,[1] the Legislature authorized a further issue of $500,000 to pay bounties.

The report of the State Treasurer made in 1866 shows that the full amount authorized by the act of February 5, 1864, had been issued, and $715,000 in bonds had been issued under the act of March 2, 1865. The reports of the State Treasurer show a further issue of $25,000 in 1868, and of $44,000 in 1870. The report of the State Treasurer made as of date September 30, 1872, and published in the Session Laws of 1873, shows that war bounty bonds had been issued and paid for from the sinking fund to the amount of $843,000, and that there were outstanding bonds issued amounting to $463,000, making a total issue under the first two acts aforesaid of $1,306,-000. No bonds appear to have been issued since. If necessity required, $694,000 might have been issued, and may still be issued, and placed to the credit of the "war fund," out of which these bounties were by law directed to be paid. It is stated in the brief of counsel for the respondent that under the call of the President for 500,-000 men the quota for Michigan was 18,282. If this quota was filled by enlistments which would entitle the volunteer to a bounty under the act of February 5, 1864, it would require $1,828,200 to pay such bounties.

It was held, however, by this Court in *People v. Hammond*, 13 Mich. 247, that the offer of a bounty under the act of February 5, 1864, did not extend to the whole 500,000 men included in the call of the President of February 1, 1864; that this call was intended to cover 300,000 made in October, 1863, leaving the act to operate only in favor of those who should enlist under the quota assigned to Michigan to make up the call for 200,000. This would

---

[1] See Act No. 295, Laws of 1865.

be two-fifths of the number assigned under the call for 500,000, or, in round numbers, 7,313 men, who, if credited under the act, would be entitled to $100 bounty, requiring only the sum of $731,300. If this be true, it would seem that there ought to be enough money in the "war fund" derived from the issue of $1,306,000 of "war bounty" bonds to pay every soldier who enlisted under this call, and entitled by the provisions of Act No. 23, Laws of 1864, to receive a bounty.

The Auditor General in his answer, however, positively avers that the fund is exhausted, and that there has been no money appropriated out of which to pay the bounty to relator. By referring to the report of the Auditor General for the year 1874, published by authority, there is a statement on page 305, Table No. 37, showing the payments of bounties by the Quartermaster General, from which it appears that the amount of bounties paid by him after the act of February 5, 1864, took effect is. $1,602,620, which considerably overdraws the bounty money in the "war fund." The Auditor General, in his report for the year ending September 30, 1872, called attention to the fact that, in his and in the Attorney General's opinion, $39,925 had been erroneously paid as bounties to soldiers; and the Legislature, by joint resolution No. 12 of the Session Laws of 1873, instructed the Attorney General to investigate and ascertain if the State had been defrauded in the payment of bounties, or whether bounties had been illegally paid. I have examined the reports of the Attorney General for the years 1873, 1874, and 1875, and no mention is made of the subject in such reports.

Upon representations that some claims for bounties had been paid upon forged or fraudulent vouchers, the Legislature of 1885, by Act No. 157, authorized the Board of State Auditors to hear and examine such claims, and, if

it should appear upon such examination that the "bounty due" said soldiers so enlisted and mustered has been paid to any other person upon forged or fraudulent vouchers, and that his bounty was still justly due him, they should so certify to the Auditor General, who should draw his warrant for the amount upon the State Treasurer, who should pay it 'out of moneys appropriated for that purpose, or from any moneys not otherwise appropriated. And as indicating the intent of the Legislature to deal justly by the soldier, and in view of what was said in *Blanchard. v. Church*, 47 Mich. 644, the Legislature declared—

"That the statute of limitations shall not be a bar to any claim by such soldier, or his widow, children, or legal representatives."

So far as the seventh clause af the respondent's answer relies upon the statute of limitations, I do not think it ought to prevail. There is no pretense that relator's bounty has been paid to him. Plighted faith between the State and its soldiers, who in the hour of the country's peril enlisted in defense of the Nation, and went forth to do battle for the honor of the flag, and the preservation of our free institutions imperiled by the civil war, who suffered untold hardship. and who all risked life, and many fell, and others were wounded, on the field of battle, will not permit the plea of the statute of limitations to bar a sacred promise made to her soldiers, no matter how long a time has elapsed between the promise and the failure to discharge the obligation according to the terms in which it was made. I cannot conceive that a great commonwealth like Michigan, that looks with pride and gratitude upon the honorable record of its soldiers in the war, could be guilty of such base ingratitude as to say to them:

"It is true, we offered you a bounty of $100 if you

would enlist, and it is true that we have not paid it to you, but it is now more than twenty-four years since the war in which you fought has successfully terminated, and you have grown old and gray and needy, and meanwhile the State has doubled her wealth, yet, as you have not called for it for so long a time, we will not pay you."

I do not understand the plea to voice the position of the Legislature or the will of the people. I think the act of the Legislature of 1881, repealing the bounty acts, in the proviso therein contained recognizes and preserves the rights of the soldier to his bounty, and is a distinct waiver, if one was needed, of the statute of limitations.

The fact set up in the answer, which must be taken as true unless issue is framed, that there is no money appropriated, is fatal to the relator's prayer. Article 14, § 5, of the Constitution, declares—

"No money shall be paid out of the treasury, except in pursuance of appropriations made by law."

And it is equally clear that where an appropriation has been made payable out of a particular fund, if the fund has become exhausted, the Auditor General would not be warranted in drawing an order upon that fund.

The Legislature, by the several acts above alluded to, have provided ample means for paying the bounties given by the State to those entitled. These acts authorize and *direct* the Governor and State Treasurer, in the name and behalf of the people of the State, whenever it shall become necessary for the purpose of paying a State bounty, to contract loans and issue bonds therefor, and pay the avails over to the credit of the "war fund," and the bounty was directed to be paid from this fund upon the warrant of the Auditor General, upon proper vouchers or estimates of the Quartermaster General of the State, certified by the Governor. This was a sufficient appropriation by the Legislature, and the Auditor General would until the act of 1881 be authorized to draw his warrant

on the "war fund" whenever the money for the purpose of paying bounties reached that fund, upon proper certificates of the Quartermaster General and Governor. I do not see as the Legislature has been remiss, or that it could do anything more. The responsibility seems to rest with the Governor and State Treasurer, who doubtless will act when they become aware of the necessity.

It remains to be noticed what was the object, intent, and effect of the repealing act of 1881. While that act preserves the right to the bounty, it repeals the acts providing for the method of ascertaining and establishing the right upon which the payment of the bounty depends. Under the act of 1871, the claimant was required to make application to the Quartermaster General, who was to make examination, and, if he found that the claimant was entitled, he was to make a certificate showing the amount due and forward it to the Auditor General. The Quartermaster General was by this act made a special tribunal for examining and allowing these particular claims against the State. By the repeal of that law the person claiming a bounty must establish his claim before the Board of State Auditors. By Article 8, § 4, of the Constitution, it is provided that—

"The Secretary of State, State Treasurer, and Commissioner of the State Land-office shall constitute a Board of State Auditors, to examine and adjust all claims against the State not otherwise provided for by general law."

I think it was the object and intent of the Legislature to do away with the authority of the Quartermaster General in allowing claims for bounties, and place claimants for bounties in the same category as others having claims against the State for adjustment. Certainly the certificate of the Quartermaster General can have no

force or effect after the law authorizing it has been repealed.

It follows from what has been said that the application of the relator must be denied, for reasons stated.

MORSE, LONG, and GRANT, JJ., concurred.